AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

AUG 31 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

|  |  |
|---|---|
| In the Matter of the Search of | ) |
|  | ) |
| 15 Rio Camino Court, Sacramento, California | ) |
|  | ) |
|  | ) |

**SEALED**

Case No.

2: 1 8 - SW - 7 3 9 ‾ KJN

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-1, attached and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. 846, 841(a)(1); | Conspiracy to possess with intent to distribute controlled substances; |
| 21 U.S.C. 841(a)(1); | Possession with intent to distribute controlled substances; |
| 18 U.S.C. 924(c) | Possessing a firearm in connection with drug trafficking |

The application is based on these facts:

**SEE AFFIDAVIT, attached and incorporated by reference.**

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DAVE SIEBER
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Aug 29, 2018

_____
*Judge's signature*

City and state: Sacramento, California          Kendall J. Newman, U.S. Magistrate Judge

_____
*Printed name and title*

**ATTACHMENT A-1**

*Location to be Searched*

**Target Residence 1,** 15 Rio Camino Court, Sacramento, California



15 Rio Camino Court is located in Sacramento, California. The building is a single-story, single-family residence. It holds about 1202 square-feet, 3 bedrooms, and 2 bathrooms.

The front door and the two-car garage of this residence face east. The home is located at the end of Rio Camino Court. It is north of the intersection of Powderhorn Way and Cattle Drive.

The residence is tan in color with white trim. The front door and garage doors are white in color. The roof is a dark grey composite shingle type.

The residence can be identified by the numbers "15," which are about 8 inches high and affixed to the garage pillar.

The search of the aforementioned location shall include any and all attachments, including attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.

## ATTACHMENT B

### *Items to be Seized*

All evidence constituting evidence, fruits, proceeds, and instrumentalities of violations of the **Target Offenses**, specifically:

1. Title 21 United States Code, Section 841(a)(1) – Distribution, manufacturing, and possession with intent to distribute controlled substances.

2. Title 21 United States Code, Sections 846 and 841(a)(1) – Conspiracy to distribute controlled substances

3. Title 18 United States Code, Section 924(c) – Using a firearm in connection with a drug trafficking offense.

This evidence includes:

1. Any controlled substances, illegal drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

2. United States currency and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

3. Money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed; electronic storage devices, computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from drug distribution and the transfer, investment, control and disposition of those proceeds;

4. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

5. Cellular telephones, telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices;

6. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, money orders, prepaid credit cards, green dot cards, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

9. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Records, items, and documents reflecting shipment or mailing of controlled substances;

11. Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person;

12. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

13. Personal property tending to show the existence and/or location of other stored narcotics including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding; and

14. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

## AFFIDAVIT OF FBI SPECIAL AGENT DAVID SIEBER

I, David Sieber, being duly sworn, hereby depose and state:

## SCOPE OF REQUESTED SEARCH WARRANTS

1.  This Affidavit is submitted in support of search warrants for:

    a.  **Target Residence 1** – 15 Rio Camino Court, Sacramento, California, more fully described in **Attachment A-1**. This is the suspected residence of A. Vern Saeteurn, hereinafter Saeteurn.

    b.  **Target Residence 2** – 3650 18th Avenue, Sacramento, California, more fully described in **Attachment A-2.** This is the suspected residence of Saeteurn's brother, Ou Saeteurn; his father, Lo Saeteurn; his mother, Cheng Saeteurn; and other unidentified family members.

2.  I assert that there is probable cause to believe that the residences described in **Attachments A-1** and **A-2** (collectively, the **Target Residences**) contain evidence, fruits, proceeds, and instrumentalities, more fully described in **Attachment B**, of the following crimes (collectively, the **Target Offenses**):

    a.  Title 21 United States Code, Section 841(a)(1) – Distribution, manufacturing, and possession with intent to distribute controlled substances

    b.  Title 21 United States Code, Sections 846 and 841(a)(1) – Conspiracy to distribute controlled substances

    c.  Title 18 United States Code, Section 924(c) – Using a firearm in connection with a drug trafficking offense

3.  **Attachments A-1**, **A-2**, and **B** are incorporated by reference.

## AGENT BACKGROUND

4.  I am a special agent with the FBI. I entered on duty at the FBI Academy in Quantico, Virginia on October 6, 2002. I am currently assigned to the FBI's Sacramento Division, Violent Crime, Safe Streets Task Force. I have been assigned to this squad since February 2011.

5.  During my employment as an FBI special agent, I have participated in numerous criminal and national security investigations. I have also participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of controlled substances and weapons. To successfully conduct these investigations, I have used a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including undercover

1

agents, informants, and cooperating sources), pen register and trap and trace devices, GPS and telephone tracking devices, trash covers, mail covers, pole cameras, stationary video recording vehicles, audio and audio/video recording devices and Title III wire taps.

6. Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations, and street gangs to smuggle and safeguard controlled substances and weapons, to distribute, manufacture, and transport controlled substances, and to collect and launder related proceeds. I have personally participated in California state wire investigations and federal Title III wire investigations.

7. In addition to the training I received at the FBI Academy, I have received specialized training in narcotics and prison-gang investigations from California state law enforcement agencies. This training has focused on topics such as drug interdiction, drug detection, money-laundering techniques and schemes, drug identification, asset identification and removal, gang classifications, gang politics, and methods used by gangs to carry out the aforementioned criminal conduct.

8. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

9. Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested search warrants, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause.

10. This affidavit is based upon my own personal knowledge but also the knowledge of other law enforcement officers involved in this investigation. Where I describe statements made by other people (including other special agents and law enforcement officers), the statements are described in sum, substance, and relevant part. Similarly, where I describe information contained in reports and other documents or records in this affidavit, this information is also described in sum, substance, and relevant part.

## STATEMENT OF PROBABLE CAUSE

11. The following facts are based on my participation in the Saeteurn investigation, which began in June 2016. The facts are based on investigative efforts including debriefings of confidential human sources (CHS's), physical surveillance, controlled narcotics purchases, audio and video recordings, the execution of search warrants, forensic downloads and searches of phones, reviews of criminal histories, and reviews of social media accounts including Facebook and Instagram.

12. In addition, I have consulted with law-enforcement officers and agents from the U.S. Postal Inspection Service (USPIS), Sacramento Police Department, Sacramento County Sheriff's Department, California Highway Patrol and California Department of

2

Corrections and Rehabilitation's (CDCR) Special Service Unit (SSU), and FBI North Idaho Violent Crimes Task Force (NIVCTF), all of whom have experience investigating narcotics trafficking offenses.

### June 2016: Reporting from CHS-1

13. In June 2016, a confidential human source ("CHS-1") identified Saeteurn as a methamphetamine and cocaine supplier in Sacramento, California. CHS-1 reported that Saeteurn possessed assault weapons and lived with his parents at **Target Residence 2**.

14. CHS-1 had begun working with the FBI in May 2016. At that time, CHS-1's motivation was to reduce or avoid criminal liability for his/her involvement in three controlled methamphetamine buys and one controlled firearms transaction, all of which were monitored by the FBI. CHS-1 was also motivated by remuneration, which the FBI provided. Audio and video equipment recorded each of CHS-1's controlled purchases. Officers also conducted surveillance, which corroborated the recordings.

15. CHS-1's criminal history includes a July 2014 felony conviction for possessing methamphetamine for sale, a violation of California Health and Safety Code Section 11378. It also includes an October 2014 felony conviction for possessing a controlled substance while armed, a violation of California Health and Safety Code section 11370.

16. During the three controlled purchases that CHS-1 conducted in this investigation, the FBI did not identify any instances of dishonesty or unlawful behavior by CHS-1. However, in June 2017, CHS-1 was arrested for unlawfully possessing a firearm. The FBI ended its relationship with CHS-1 at that time. CHS-1 was also arrested in July 2017 for another unlawful firearm possession. CHS-1 is now facing federal criminal charges and is not receiving assistance from the FBI.

### July 14, 2016: Controlled Methamphetamine Buy

17. On July 14, 2016, CHS-1 conducted a controlled, two-ounce methamphetamine purchase from Saeteurn at a Special Food Market located at 4614 Martin Luther King Junior Blvd., Sacramento, California.[1]

---

[1] In each controlled purchase, CHS-1 met with investigators at a staging area prior to the transaction. Investigators searched CHS-1's body to confirm that CHS-1 did not possess any contraband. They provided CHS-1 with discreet audio and video surveillance equipment and recorded currency to make the controlled purchase. CHS-1 walked to the buy location under investigator surveillance. When CHS-1 completed each transaction, officers watched him/her return directly to the staging area. Upon arriving, CHS-1 provided the contraband to investigators, who again searched CHS-1 to ensure that she/he did not possess other, unexplained contraband. After each controlled purchase, investigators also recovered CHS-1's audio/video surveillance equipment.

18. About six minutes before CHS-1 met with Saeteurn, surveillance agents saw a black Dodge sedan bearing California license plate number 7RFK019 ("the black Dodge") leave **Target Residence 2**.

19. The black Dodge was registered to EAN Holdings (Enterprise Car Rentals). A rental agreement subsequently obtained from Enterprise Car Rentals identified Saeteurn as the black Dodge's renter. On the agreement, Saeteurn listed **Target Residence 2** as his home address.

20. In my experience, drug traffickers often use rental vehicles because initial registration checks lead officers to the rental company instead of the drug trafficker's residence. Drug traffickers sometimes rent vehicles in their own names but often enlist the assistance of friends and family members to further insulate their identities. Also, rental vehicles can be easily swapped for other rental vehicles, thereby creating challenges for officers to see drug trafficker's locations and patterns.

21. Saeteurn met with CHS-1 in front of the Special Food Market in the black Dodge. Saeteurn told CHS-1 that it had been "hot" and noted that he suspected a passing van was law enforcement. As a result, CHS-1 and Saeteurn entered the market. Inside the market, CHS-1 paid Saeteurn $400 for two ounces of methamphetamine, which Saeteurn produced from his right front pocket.

22. CHS-1 and Saeteurn left the market. Saeteurn departed in the black Dodge. CHS-1 returned to the staging area, where an agent recovered the methamphetamine and audio/video recording equipment. A Nartec test produced a presumptively positive result for methamphetamine.

### July 22, 2016: Controlled Methamphetamine Buy

23. On July 22, 2016, CHS-1 conducted a second, controlled, two-ounce methamphetamine purchase from Saeteurn. This time, CHS-1 and Saeteurn met in the Starbucks parking lot located at 4424 Freeport Blvd., Sacramento, California.

24. Prior to the buy, CHS-1 called Saeteurn and attempted to negotiate the purchase of a quarter-pound of methamphetamine. Saeteurn said that he could only sell CHS-1 two ounces.

25. At about 2:30 p.m., prior to CHS-1 meeting with Saeteurn, surveillance officers saw a white Nissan sedan bearing California license plate 7SIK344 ("the white Nissan") parked in the driveway at **Target Residence 2**. The Nissan's registered owner was EAN Holdings (Enterprise Car Rentals). A rental agreement later obtained from Enterprise identified Kelly Shaver as the renter. The renter's address was 2118 Bluebird Lane, Sacramento, California. I am unfamiliar with Kelly Shaver's name or any connection she might have to Saeteurn.

26. At the direction of law enforcement officers, CHS-1 walked from the staging area to the Starbucks parking lot. CHS-1 entered the Starbucks and used the bathroom. Because

CHS-1 had passed out of the surveillance team's line-of-sight, a surveillance team member entered the Starbucks bathroom. The team member searched CHS-1 a second time to ensure that he/she had not obtained additional contraband. The team member obtained negative results.

27. About one minute later, at about 2:54 P.M., CHS-1 walked out of the Starbucks and got into the front passenger seat of the white Nissan, which Saeteurn had parked near the front of the Starbucks. While the white Nissan was parked, Saeteurn produced a plastic bag of methamphetamine from his left front pocket. Saeteurn assured CHS-1 that the methamphetamine was good quality. CHS-1 paid Saeteurn $400 for the methamphetamine. CHS-1 got out of the white Nissan, and Saeteurn drove away. Agents surveilled CHS-1 as he/she returned to the staging area.

28. A Nartec test of the substance produced a presumptively positive presumptive result for the presence of methamphetamine.

### *August 18, 2016: Controlled Methamphetamine Buy*

29. On August 18, 2016, CHS-1 called Saeteurn and arranged to purchase a half-pound of methamphetamine for $1,500. They met again in the Starbucks parking lot located at 4424 Freeport Blvd., Sacramento, California.

30. At about 2:30 p.m., surveillance agents identified a black Chevrolet Camero parked in the driveway of **Target Residence 2**. At the time, agents were unable to record the Camero's license plate. However, prior reporting by CHS-1 indicated that Saeteurn often drove a dark-colored newer-model Camero.

31. At the direction of law enforcement agents, CHS-1 walked directly from the staging area to the Starbucks parking lot. At about 3:19 p.m., Saeteurn arrived as the driver and sole occupant of a black Chevrolet Camero bearing California license plate number 7BHS764 ("the black Camero").

32. A California DMV database search identified Nai Sio Saechao as the registered owner of the black Camero. I believe that Saeteurn and Saechao are friends and that Saeteurn likely borrowed the black Camero to deliver the half pound of methamphetamine to CHS-1. I believe this partly because a review of public Facebook profiles indicates that Saechao is Facebook friends with Saeteurn and with his brother, Ou Saeterun.

33. CHS-1 got in to the black Camero's front passenger seat, and Saeteurn drove southbound on Freeport Blvd. The surveillance team followed. Inside the black Camero, Saeteurn produced a plastic bag of methamphetamine from his pocket, and CHS-1 paid Saeteurn $1,500. Saeteurn was preoccupied with a phone call during the entire transaction. About three minutes later, at about 3:22 p.m., Saeteurn dropped CHS-1 off at the Raley's Market located at 4850 Freeport Blvd., Sacramento, California. Saeteurn departed in the black Camero, and handling agents picked up CHS-1.

34. A Nartec test produced a presumptively positive result for the presence of methamphetamine in the substance Saeteurn had sold.

### *April 10, 2018: Methamphetamine and Firearm Silencer Interdiction*

35. On April 10, 2018, USPIS investigators applied for and received a federal search warrant for a package that had been sent from Sacramento, California, to Coeur D'Alene, Idaho. Inside the package, investigators found a baggie containing about a quarter-pound of methamphetamine and the components for a firearm silencer.

36. Later that day, investigators delivered the package to the recipient's residence. The recipient personally accepted the package. Officers then executed an Idaho state search warrant on the recipient's Coeur D'Alene residence.

37. During the search, officers Mirandized the recipient ("CHS-2"), who agreed to cooperate with the FBI to reduce her criminal exposure for this instance of possessing methamphetamine for sale. At the beginning of the interview, CHS-2 was somewhat deceptive and attempted to minimize her involvement in criminal activity. However, she later became fully forth-coming and appeared to tell the truth. FBI North Idaho Violent Crimes Task Force (NIVCTF) investigators did not extend any promises to CHS-2 regarding her cooperation. CHS-2 is not receiving remuneration for her cooperation.

38. CHS-2's criminal history includes two misdemeanor convictions for driving under the influence. CHS-2 admits that she is a methamphetamine addict who has been using methamphetamine for about six years. She also admits to distributing methamphetamine. While searching her residence on April 10, 2018, investigators found a methamphetamine pipe and baggie of methamphetamine in her bedroom.

39. Also while searching her residence, investigators found evidence suggesting that CHS-2 was engaged in financial transaction card (FTC) fraud. CHS-2 admitted that she had manufactured fraudulent FTC's in the past and had purchased stolen FTC numbers from websites.

40. On August 3, 2018, a man in Hope, Idaho, contacted the FBI's Public Access Line and reported that CHS-2 was involved in bank fraud and methamphetamine sales. The man said he had stayed with CHS-2, her sister, and at least one other woman for two days. On August 14, 2018, NIVCTF investigators interviewed the caller. He said CHS-2's sister – not CHS-2 – was the person engaged in bank fraud. Additionally, the caller reported that a woman residing with CHS-2 was distributing methamphetamine.

41. CHS-2 has reported that she and Saeteurn had a close, personal relationship. They were romantically involved between about 2007 and 2016. They continue to have sexual intercourse on occasion. CHS-2's child considers Saeteurn a father figure, though he is not her biological father. Saeteurn has sometimes paid CHS-2 for sex, and in an effort to support herself and her child, CHS-2 has accepted the payment. Saeteurn has also sometimes used methamphetamine to pay CHS-2 for sex.

42. CHS-2 was unaware of the FBI's 2016 investigation into Saeteurn. Nevertheless, she reported that the intercepted Sacramento package had been sent by Saeteurn. She reiterated that Saeteurn was the sender even though the return address listed her father

and father's home address.  CHS-2 explained that, since about October 2017, Saeteurn had sent CHS-2 about ten packages containing between a quarter-pound and a full pound of methamphetamine.  They included one-pound methamphetamine shipments in both October 2017 and November 2017.

43. CHS-2 also reported that, on behalf of Saeteurn, one of her Sacramento-area family members had sent methamphetamine packages to CHS-2 via Federal Express.

44. CHS-2 further admitted that she had driven from Idaho to Sacramento in November 2017 in order to pick up methamphetamine from Saeteurn.  She had then returned to sell the methamphetamine in Idaho.

45. Inspectors from the U.S. Postal Service had previously confirmed that, between December 2017 and April 2018, CHS-2 had received four U.S. Mail parcels from Sacramento.  Investigators have not queried whether other common carriers, such as Federal Express, delivered shipments between Sacramento and CHS-2's home in Idaho.

### April to August 2018: CHS-2 Information about Saeteurn and Firearms

46. CHS-2 said she was seeking firearms silencer parts for Saeteurn.  She said he had purchased the silencer in the intercepted box and previously sent it to Saeteurn.  However, he did not like the silencer, so he told her that he would send it back to her.

47. Inspectors from the U.S. Postal Service had previously confirmed that CHS-2's Idaho home had received packages from a company called Silencer Co, which seems to sell firearms suppressors.  The packages had been addressed to an alias that CHS-2 confirmed she uses.

48. In August 2018, CHS-2 said Saeteurn possessed FN and HK pistols and a shortened assault weapon.  On August 16, 2018, the Automated Firearms System (AFS) indicated that an HK 9 mm pistol and an FN 5.7 mm pistol were registered to Saeteurn.  It also indicated that Saeteurn owned a Glock .40 pistol, a Springfield .40 firearm, and a 12-gauge shotgun.  CHS-2 reported that Saeteurn usually carries a firearm on his person.

### April to August 2018: CHS-2 Information about the Target Residences

49. In April 2018, CHS-2 reported that, in about 2016, Saeteurn's parents – Lo Saeteurn and Cheng Saeteurn – received a raw opium shipment from family members in Asia.  She said the opium had been hidden in a pair of ceremonial antlers.  CHS-2 said she saw Saeteurn's parents convert the opium into black tar heroin at **Target Residence 2.**[2]

---

[2] CHS-2 initially reported that Saeteurn's parents resided at 3605 18th Avenue.  However, the Sacramento County Sheriff's Department database does not connect 3605 18th Avenue with

50. CHS-2 estimated that the parents made more than $100,000 from the opium shipment and sent about $20,000 back to the opium source in Asia. Although CHS-2 did not have firsthand knowledge or see the arrival of other opium shipments at **Target Residence 2**, she believed that Lo and Cheng Saeteurn had repeated this process several times.

51. CHS-2 reported that several of Saeteurn's brothers also distributed narcotics. For example, Ou Saeteurn supplied CHS-2 with about two ounces of methamphetamine in about November 2017. On that occasion, Ou Saeteurn gave the methamphetamine to CHS-2 while they were in front of **Target Residence 2**. CHS-2 reported that Ou Saeteurn lived at **Target Residence 2**.

52. In August 2018, CHS-2 reported that Saeteurn currently lived at **Target Residence 1**. Although she wasn't certain, CHS-2 did not believe that Saeteurn would keep his drug supply at **Target Residence 1**, because children are often at the house. CHS-2 said that Saeteurn used to keep his drug supply at **Target Residence 2** and that she still believed that could be the case. CHS-2 also said that 3648 18th Avenue, Sacramento, a third residence associated with the Saeteurn family, could be a storage location for Saeteurn's drugs.

### *April to August 2018: Recorded Communications between CHS-2 and Saeteurn*

53. Between April and August 2018, CHS-2 called Saeteurn at 916-767-1024 and recorded their conversations. Verizon records do not identify a subscriber for this phone number. However, CHS-2 identified the phone as Saeteurn's. Based on my training and experience, I believe that it is common for drug traffickers to subscribe to phones in the name of others or to provide no subscription information at all. They employ this tactic to remain anonymous and to avoid detection by law enforcement.

54. During a call on or about April 16, 2018, Saeteurn told CHS-2 that he was "out of work." CHS-2 understood this to mean Saeteurn did not have any methamphetamine to sell.

55. During a call on or about May 11, 2018, Saeteurn told CHS-2 that he was nervous about selling drugs right now and would not be able to send any to CHS-2 in Idaho.

56. During several calls on or about May 21, 2018, Saeteurn told CHS-2 he was leery of sending anything to CHS-2 because law enforcement officers had recently searched and arrested "Black," one of his Sacramento associates. CHS-2 reported that, at the end of one of these calls, Saeteurn agreed to send methamphetamine to her. However, this portion of their conversation was not captured by the recording device, whose battery had expired. The delivery never happened.

---

Saeteurn or any of his relatives. I believe CHS-2 mistakenly inverted two of the numbers in Saeteurn's parents' address: **Target Residence 2** is 3650 18th Avenue. The Sacramento County Sheriff's Department identified this as the address of record for Saeteurn.

57. During a call on or about June 27, 2018, Saeteurn told CHS-2 that he might be driving to Washington to pick up $100,000 for his "friends down south," who were unable to launder the money in Washington. Saeteurn said the friends would pay him $10,000 for making the trip. Saeteurn also agreed to send methamphetamine to CHS-2 via one of CHS-2's relatives, who was planning to travel to Idaho in July 2018. That trip and delivery never happened.

58. During a call on or about July 12, 2018, CHS-2 asked, cryptically, if Saeteurn would send methamphetamine. Saeteurn reluctantly agreed and said he didn't want to see CHS-2 suffer.

59. On or about July 13, 2018, Saeteurn agreed to send methamphetamine with a female associate who was planning to visit CHS-2 in Idaho. CHS-2 believed that Saeteurn would send the methamphetamine without payment.

60. On or about August 14, 2018, CHS-2 sent a text message to Saeteurn at telephone number 916-767-1024. CHS-2 advised that, typically, Saeteurn did not discuss narcotics transactions via text message. Nevertheless, at the request of an FBI agent, CHS-2 told Saeteurn she was heading to Sacramento and then asked, "how much for the whole one?" CHS-2 believed Saeteurn understood "whole one" to mean one full pound of methamphetamine. CHS-2 then sent another text that read, "I told them between 23-26." CHS-2 understood $2,300 and $2,600 to be the current street price for one pound of methamphetamine. Saeteurn replied, "U coming by yourself?" Saeteurn and CHS-2 exchanged several text messages, but Saeteurn never confirmed the methamphetamine price.

***August 16, 2018: Attempted Methamphetamine Buy***

61. CHS-2 reported that, during a call on or about August 16, 2018, she informed Saeteurn that she was traveling to Sacramento and that she wanted to meet with him. CHS-2 also referred to the text messages she had sent on August 14, 2018, in which she had asked whether a "whole one" would cost "23-26." Saeteurn told CHS-2 he'd talk about it when he saw her.

62. At about 6:45 p.m. on August 16, 2018, a surveillance team saw Saeteurn leave **Target Residence 1** in a black BMW sedan bearing California license plate number 8DGU746 ("the black BMW"). California DMV records identified Cynthia Saeteurn as its registered owner. According to CHS-2, Cynthia Saeteurn is Saeteurn's cousin. She also reported that Saeteurn and Ou Saeteurn often enlist family members to purchase and register vehicles because they are not employed and do not have established credit.

63. At about 7:45 p.m., the surveillance team saw Saeteurn return to **Target Residence 1** and enter the residence through what appeared to be the front door. At about 7:55 p.m., Saeteurn got back into the BMW and left **Target Residence 1**.

64. At about 8:00 p.m. that night, agents picked up CHS-2 and prepared her to conduct the controlled purchase of one pound of methamphetamine from Saeteurn.

65. At about 8:31 p.m., CHS-2 conducted a recorded call with Saeteurn. She told Saeteurn that she was at a restaurant with a female friend. CHS-2 was not actually with a female friend but was using this story as a ruse to facilitate a timely narcotics transaction. Saeteurn asked CHS-2, "Will she let me fuck her?" CHS-2 said no and explained that her fictitious friend was engaged and not the type. Saeteurn replied, "I really wanted to fuck." The topic turned to the pound of methamphetamine. Saeteurn asked, "You said you went and grabbed the money already?" CHS-2 affirmed.

66. Saeteurn continued with more unwanted sexual advances and said, "I coulda just came by, fucked you, and you gave me the money." CHS-2 explained to Saeteurn that CHS-2 needed to get "that," meaning the methamphetamine, mailed out first thing in the morning. Saeteurn asked, "You want me to just get it real quick and then come by and do a quickie real quick?"

67. CHS-2 suggested that Saeteurn meet her at the restaurant. Saeteurn replied, "No, I want fuck you." CHS-2 told Saeteurn, "I can meet you in the middle. You wanna come in? Or I can run out to you." Saeteurn replied, "You mean get the stuff, you mean right now?" Then, he added, "Tell her you got it already. … Tell her you'll mail it out first thing in the morning. … All I gotta do is go get it. That's it. It's not that hard. It's there, you know what I mean. It's good. Just tell her you got it in your hands already and you'll mail it out first thing in the morning." During the call, CHS-2 and Saeteurn did not settle on a time or location to meet.

68. At about 8:45 p.m., CHS-2 began to express guilt that she was helping to gather evidence that might lead to criminal charges against Saeteurn. To ease her mind, I told her that another cooperator had completed controlled narcotics purchases with Saeteurn "in the past." I did not provide details about these previous purchases. Nevertheless, this information seemed to reassure CHS-2.

69. At about 8:49 p.m., Saeteurn unexpectedly called CHS-2 and said he was at the restaurant where CHS-2 had claimed to be. Saeteurn wanted to know where CHS-2 was. CHS-2 told Saeteurn she was at a market near the restaurant. Saeteurn offered to wait for CHS-2. Surveillance agents confirmed that Saeteurn had arrived at the restaurant. He had been driving and was the sole occupant of the black BMW.

70. At about 8:59 p.m., agents provided CHS-2 with $2,400 in recorded buy funds and began controlled buy procedures. At about 9:03 p.m., agents surveilled CHS-2 as she left the staging area on foot to meet with Saeteurn.

71. A few minutes later, concerned about Saeteurn's sexual advances and the safety of CHS-2, agents decided to cancel the controlled buy. Handling agents picked CHS-2 up at about 9:06 p.m., before she had arrived at the restaurant. CHS-2 subsequently sent Saeteurn a series of ruse text messages. Saeteurn accepted the ruse and agreed to meet CHS-2 later.

72. At about 9:15 p.m., the surveillance team saw Saeteurn leave the restaurant in the black BMW and drive back to **Target Residence 1**. Agents saw Saeteurn enter what appeared to be the front door of **Target Residence 1**.

*August 2018: Recorded Communications with Ou Saeteurn*

73. In August 2018, CHS-2 informed me that Ou Saeteurn used telephone number 916-206-0262.  A law enforcement database search identified 89-year-old Shirley Webber as the subscriber of this telephone.  I am unfamiliar with Shirley Webber and have not identified any connection to Ou Saeteurn.  However, as I previously stated, my training and experience have taught me that it is common for drug traffickers to subscribe to phones in the name of others or to provide no subscription information at all.  They employ this tactic to remain anonymous and to avoid detection by law enforcement.

74. On August 15, 2018, Ou Saeteurn sent CHS-2 a text message asking when she was going to return to Sacramento.

75. At 2:49 a.m. on August 17, 2018, Ou Saeteurn sent another text message asking when CHS-2 was going to be in Sacramento.  Specifically, he said, "if so then can I see you for a bit and I'll stop bothering you and call it even with what you owe me."

76. CHS-2 explained to me that she owed a drug debt to Ou Saeteurn.  CHS-2 and I believed that Ou Saeteurn was attempting to collect this debt by soliciting sex with CHS-2.  CHS-2 admitted having had consensual sex with Ou Saeteurn about eight months earlier but now considered this advance unwanted.

77. Later that day, I instructed CHS-2 to offer to repay her drug debt and obtain new controlled substances from Ou Saeteurn.  CHS-2 exchanged a series of text messages with him, as described below.

> CHS-2: "Hey I have part of my money for you. Im shy like $200 but I can get it to you later tonight. Can I grab something from you? I feel like doing a line or 5……lol."
>
> Ou Saeteurn: "Yeah just hit me up later. We can do a line or 5 together."
>
> CHS-2: "Ok I can meet you at your place….lol well pick you up from the house if you want? I have a rental….suv style."
>
> Ou Saeteurn: "Haha or I can get a room.. Lol."
>
> CHS-2: "Where do you have to go get it from?"
>
> Ou Saeteurn: "I Do but its hard to get. So when I get it, it's expensive and I Just ran out like 2 days ago. But we'll talk about it later." … "Yup like really expensive! They wanted 4k more than what I usually get it for." … "What time are you free and you can give me 400 for what you owe me instead of 750."

78. According to CHS-2, her use of the phrases "your place" and "the house" was meant to refer to **Target Residence 2**.

11

79. The current street price for one kilogram of cocaine ranges between $23,000 and $26,000.  Therefore, because Ou Saeteurn referenced a $4,000 increase in the price of cocaine, I believe that he distributes pounds or possibly kilograms of cocaine.  I also believe that Ou Saeteurn's reference to doing a "line or 5" with CHS-2 indicates that he possessed a sales quantity of cocaine.

### *June to August 2018: Surveillance at the Target Residences*

80. Three times in the last 10 weeks – on June 20, 2018; on June 22, 2018; and on August 16, 2018 – surveillance agents have seen a black Honda Accord and a GMC Yukon parked in front of **Target Residence 1**. The Honda had California license plate 7WIS325, and the GMC had California license plate 7ZPY065.  California DMV records listed Saeteurn as the registered owner of both vehicles.

81. On June 20, 2018, surveillance agents saw a silver Infiniti coupe with California license plate 7PCP489 parked in front of **Target Residence 2**.  California DMV records identified Sou Vern Saeteurn as its registered owner.   CHS-2 reported that Sou is one of Saeteurn's brothers.  Sou is also a Facebook friend of Saeteurn's.

82. CHS-2 previously reported that Ou Saeteurn drives a gray Infiniti G35. As stated previously, CHS-2 believes that Saeteurn and his brothers often purchase and/or register vehicles in the names of family members.  Therefore, I believe that this silver Infiniti coupe, parked in front of **Target Residence 2**, may be the gray Infiniti G35 that Ou Saeteurn drives.

### *February 2017 and August 2018: Utility Checks at the Target Residences*

83. On February 10, 2017, and again on August 16, 2018, the Sacramento Municipal Utilities District (SMUD) confirmed that Saeteurn had active SMUD accounts at **Target Residence 1** and **Target Residence 2**.

### *Summary of Evidence Related to Search Locations*

84. The following is a summary of the probable cause to believe that the **Target Residences** will contain evidence, fruits, proceeds, and instrumentalities of the **Target Offenses**:

    a. In June 2016, CHS-1 reported that Saeteurn possessed assault weapons and lived with his parents at **Target Residence 2**.  *See* ¶ 13.

    b. On July 14, 2016, Saeteurn sold CHS-1 two ounces of methamphetamine.  The car Saeteurn drove to this transaction was parked at **Target Residence 2** about six minutes before Saeteurn met with CHS-1.  *See* ¶¶ 18 - 22.

    c. On July 22, 2016, Saeteurn sold CHS-1 two ounces of methamphetamine.  The car Saeteurn drove to this transaction was parked at **Target Residence 2** less than 30 minutes before Saeteurn met with CHS-1.  *See* ¶¶ 25 - 27.

d.  On August 18, 2016, Saeteurn sold CHS-1 a half pound of methamphetamine.
    The car Saeteurn used during this transaction was parked at **Target Residence 2**
    less than one hour before Saeteurn met with CHS-1. *See* ¶¶ 30 - 31.

e.  CHS-2 reported that, in about 2016, she saw Saeteurn's parents – Lo Saeteurn and
    Cheng Saeteurn – convert opium into black tar heroin at **Target Residence 2**.
    *See* ¶ 49.

f.  On February 10, 2017, SMUD confirmed that Saeteurn had active accounts at
    both of the **Target Residences**. *See* ¶ 80.

g.  CHS-2 said that, in November 2017, she had driven from Idaho to Sacramento in
    in order to pick up methamphetamine from Saeteurn. She had then returned to
    sell the methamphetamine in Idaho. *See* ¶ 44.

h.  On April 10, 2018, CHS-2 reported that, since about October 2017, Saeteurn had
    sent her about ten packages containing between a quarter-pound and a full pound
    of methamphetamine. They included one-pound methamphetamine shipments in
    both October 2017 and November 2017. *See* ¶ 42.

i.  Inspectors from the U.S. Postal Service confirmed that, between December 2017
    and April 2018, CHS-2 had received four U.S. Mail parcels from Sacramento.
    *See* ¶ 45.

j.  In August 2018, CHS-2 reported that Saeteurn lived at **Target Residence 1**. *See*
    ¶ 52.

k.  California DMV records corroborated her statement. On June 20, June 22, and
    August 16, 2018, surveillance agents saw a black Honda Accord and a GMC
    Yukon parked in front of **Target Residence 1**. California DMV records listed
    Saeteurn as the registered owner of both vehicles. *See* ¶ 81.

l.  FBI surveillance also corroborated CHS-2's statement. At about 6:45 p.m. on
    August 16, 2018, a surveillance team saw Saeteurn leave **Target Residence 1** and
    return at about 7:45 p.m. Saeteurn left again at about 7:55 p.m. and, at about 9:15
    p.m., left to drive back to **Target Residence 1**. *See* ¶¶ 62 – 63.

m.  In August 2018, CHS-2 reported that Saeteurn usually carries a firearm on his
    person. She said that Saeteurn possessed FN and HK pistols and a shortened
    assault weapon. *See* ¶ 48.

n.  On August 16, 2018, the Automated Firearms System (AFS) corroborated CHS-
    2's statement. The database indicated that an HK 9 mm pistol and an FN 5.7 mm
    pistol were registered to Saeteurn. It also indicated that Saeteurn owned a Glock
    .40 pistol, a Springfield .40 firearm, and a 12-gauge shotgun. *See* ¶ 48.

o. In August 2018, CHS-2 said she did not believe that Saeteurn would keep his drug supply at **Target Residence 1**, because children are often at the house. *See* ¶ 52.

p. In August 2018, CHS-2 said that Saeteurn used to keep his drug supply at **Target Residence 2** and that she still believed that could be the case. *See* ¶ 52. The FBI surveillance from 2016, of which she was unaware, corroborated her statement.

q. SMUD records further corroborated CHS's statement. On August 16, 2018, they confirmed that Saeteurn still had active accounts at both of the **Target Residences**. *See* ¶ 80.

r. On August 16, 2018, Saeteurn told CHS-2 that, in order to satisfy her request for "the stuff" – presumably one pound of methamphetamine, "All I gotta do is go get it. That's it. It's not that hard. It's there, you know what I mean. It's good." *See* ¶ 67. Saeteurn's statements indicate that his drug supply is in a location to which he has ready access.

s. CHS-2 reports that Ou Saeteurn distributes narcotics. In November 2017, Ou Saeteurn sold her two ounces of methamphetamine while they were in front of **Target Residence 2**. *See* ¶ 51.

t. CHS-2 reports that Ou Saeteurn currently lives at **Target Residence 2**. *See* ¶ 51.

u. FBI surveillance partially corroborates this statement. On June 20, 2018, a surveillance agent saw a silver Infiniti coupe with California license plate 7PCP489 parked in front of **Target Residence 2**. California DMV records identified Sou Vern Saeteurn as its registered owner. CHS-2 reports that Ou Saeteurn drives a very similar car – a gray Infiniti G35. CHS-2 also believes that Saeteurn and his brothers often purchase and/or register vehicles in the names of family members. *See* ¶¶ 82 – 83. Therefore, I believe the Infiniti coupe that the surveillance agent saw may be the car that, according to CHS-2, Ou Saeteurn drives.

v. On August 17, 2018, Ou Saeteurn told CHS-2 that they could "do a line or 5 together." *See* ¶ 77. After CHS-2 offered to meet him at his "place" or "pick [him] up from the house," by which she meant **Target Residence 2**, Ou Saeteurn continued to make plans to meet her and to discuss apparent cocaine prices and drug debts. *See* ¶¶ 77 – 78.

## TRAINING AND EXPERIENCE

85. Based on my training and experience, and consultations with other federal, state and local law enforcement personnel, I believe the following to be true:

a. Persons involved in the distribution of controlled substances often maintain at their residences, outbuildings, secondary residences, businesses, and vehicles, quantities of controlled substances, as well as paraphernalia for manufacturing,

14

use, packaging, and distribution of controlled substances. Drug traffickers also maintain records relating to their trafficking activities in these same places. It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live. *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986). It is also my training and experience that where criminal activity is long-term or ongoing, equip.m.ent and records of the crime will be kept for some period of time. *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991). These records include personal calendars, address/telephone books, and papers reflecting the names, addresses, pager, telephone, and fax numbers relating to their drug trafficking associates. These records can be in written form. Drug traffickers also keep stored messages and telephone numbers relating to their trafficking activities within electronic communication devices. Further, drug traffickers often keep photographs and audio/video recordings depicting themselves and their associates, as well as their assets and controlled substances. They may also keep electronic equip.m.ent used for counter surveillance including scanners, cameras, monitors, and anti-bugging devices.

b.  Premises and vehicles used by individuals involved in drug dealing usually contain articles of personal property showing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premise or property.

c.  Persons involved in the distribution of controlled substances often maintain records and ledgers listing their trafficking activities in these same places. These records are kept to keep track of the ordering, purchasing, storage, distribution and transportation of controlled substances. After drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, track the status of accounts receivable and accounts payable, and to record the names and telephone numbers of suppliers, customers and co-conspirators. These records are often maintained not only on paper, but also as electronic or digital data in the form of computer hardware and software.

d.  Individuals involved in drug trafficking often use telephones, cellular telephones, electronic pagers, beepers, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business. Individuals involved in drug trafficking must often rely on others to obtain drugs and to help obtain, market, distribute, and/or protect drugs. To achieve some of the aforementioned objectives, I am aware that drug distributors will often, among other methods, have a courier transport drugs or drug proceeds or ship controlled substances/drug proceeds through the mail or by common carrier. Evidence related to the identities of these co-conspirators are often maintained in these locations.

e.  Individuals involved in drug trafficking often maintain large amounts of U.S. currency to maintain and finance their on-going drug business. In addition, assets generated by their drug business are typically kept on-hand by drug dealers to avoid detection by authorities and/or reporting requirements. Individuals

involved in drug trafficking often attempt to legitimize the source of these profits. In order to do this, they attempt to secrete, transfer and conceal the money by, among other way: (a) Placing assets in names of nominees to avoid detection, while still maintaining control of the assets (S); (b) Laundering money through what appears to be a legitimate business or businesses; (c) Hiding money in their homes, safes, or safety deposit boxes; (d) Using money to buy assets which are hard to trace by law enforcement. Records of these transactions are often found in the aforementioned locations.

f.   Additionally based on my training and experience and the training and experience of other investigators, I know persons involved in narcotic trafficking acquire personal and real property with their narcotic proceeds, and maintain evidence of financial transactions related to obtaining, transferring, secreting, or the spending of large sums of money made from drug trafficking activities. These records include bank statements, passbooks, money drafts, checkbooks, tax returns, loan statements, escrow files, and wire transfer records. Persons involved in drug trafficking will often convert the currency into cashier's checks, bearer bonds, precious metals, gold, diamonds, and other jewelry in an attempt to hide large amounts of currency, and that evidence of such will be located at the described locations.

g.   Individuals involved in narcotics trafficking often take, or cause to be taken, photographs of themselves, their associates, their property, and/or their drugs, and usually maintain these photographs in the aforementioned locations.

h.   Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, and/or in their vehicles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during drug transactions. These weapons and firearms can be used, and often are used, as an instrumentality of the crime of drug possession and distribution. Therefore, I am requesting permission to seize weapons, firearms, and ammunition that may be found at the premises or in the vehicles to be searched, as indicated in the Attachment B attached to each of the locations requested.

i.   Individuals involved in drug trafficking often conceal evidence of their involvement in vehicles and outbuildings in order to prevent detection and seizure by law enforcement conducting lawful search warrants at residences. Therefore I am requesting permission to search all vehicles and outbuildings located at each of the locations requested.

j.   Your affiant further believes that persons involved in the distribution of drugs will store items, further described in Attachment B, which is incorporated herein by reference, and that those items are used by drug traffickers in furtherance of their drug trafficking, or are obtained by drug traffickers as a result of their drug trafficking.

k. Based on my training, experience and conversations with other experienced agents, I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income. These methods include cash purchases, the purchasing of numerous monetary instruments with cash in amounts less than $10,000, the use of aliases and nominees, the use of businesses as "front" in an attempt to legitimize and conceal their activities and the use of "off-shore" banking in an attempt to break the paper trail. These and other schemes are commonly referred to as "money laundering".

l. Individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accounts to complete financial statements and tax returns for their business and personal returns.

m. Persons engaged in illegal activities and/or money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records. Records of this kind are also often stored on computer media.

n. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, video recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence.

o. Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money orders, green dot cards, prepaid credit cards, traveler's checks, wire transfers, etc. Records of such instruments are routinely maintained at the individual's residence or place of business.

p. The terms "evidence" and "documents" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such evidence or documents, their drafts or their modifications may have been crated or stored.

## REQUEST FOR NIGHT SERIVCE

86. Rule 41(e)(2)(A)(ii) authorizes an issuing judge to authorize nighttime service upon a showing of good cause.  Here, I request the authority to execute the requested warrants between 5 a.m. and 10 p.m.  Nighttime service will minimize the destruction of evidence, protect against the flight of criminal confederates, and better ensure the safety of the occupants of the **Target Residences** and searching law enforcement officers.  Good cause exists because AFS indicates that Saeteurn currently has the following registered firearms:  HK 9mm, Glock .40, FN 5.7mm, Springfield .40 and a 12-gauge shotgun.  An FN is a 5.7mm high-velocity semi-automatic pistol, capable of defeating law-enforcement body armor.  In addition, CHS-2 reports that Saeteurn carries guns on his person.  She also reports that Saeteurn has shot at other people before and been wounded by bullets.  Finally, this investigation involves the coordinated execution of searches at two locations.  Therefore, to minimize the destruction of evidence, protect against the flight of criminal confederates, and better ensure the safety of the occupants of the **Target Residences** and searching law enforcement officers, I hereby request authority to execute these search warrants between the hours of 5 a.m. and 10 p.m.

## CONCLUSION

87. Based on the foregoing facts, there is probable cause to believe that evidence of the **Target Offenses** will be found at the **Target Residences**, more specifically described **Attachments A-1** and **A-2**.  I hereby request that this court issue warrants to search the **Target Residences** for the items listed in **Attachment B** and, if those items are found, provide law enforcement with the authority to seize them**.**

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

DAVID SIEBER
FBI Special Agent

Sworn and Subscribed to me on August 29, 2018

Hon. Kendall J. Newman
United States Magistrate Judge

Approved as to form:

AMANDA BECK
Assistant United States Attorney

## ATTACHMENT A-1

### *Location to be Searched*

**Target Residence 1,** 15 Rio Camino Court, Sacramento, California



15 Rio Camino Court is located in Sacramento, California.  The building is a single-story, single-family residence.  It holds about 1202 square-feet, 3 bedrooms, and 2 bathrooms.

The front door and the two-car garage of this residence face east.  The home is located at the end of Rio Camino Court.  It is north of the intersection of Powderhorn Way and Cattle Drive.

The residence is tan in color with white trim.  The front door and garage doors are white in color.  The roof is a dark grey composite shingle type.

The residence can be identified by the numbers "15," which are about 8 inches high and affixed to the garage pillar.

The search of the aforementioned location shall include any and all attachments, including attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.

## ATTACHMENT A-2

### *Location to be Searched*

**Target Residence 2,** 3650 18th Avenue, Sacramento, California





3650 18th Avenue, is located in Sacramento, California.  The building is a single-story, single-family residential home.  It holds 1305 square feet, 4 bedrooms, and 2 bathrooms.  On the southwest side of the residence, there is a single car garage.

The house is light blue with white trim.  It also has a gray and a black composite shingle roof.

The front door has a black security screen and faces west.  All of the windows on the residence have black security bars. A four-foot chain link fence encloses the front yard and a six-foot wood fence encloses the backyard.

The address number "3650" is attached to the front of the residence on the right side of a small window and the left side of the door.

The search of the aforementioned location shall include any and all attachments, including attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.

**ATTACHMENT B**

*Items to be Seized*

All evidence constituting evidence, fruits, proceeds, and instrumentalities of violations of the **Target Offenses**, specifically:

1. Title 21 United States Code, Section 841(a)(1) – Distribution, manufacturing, and possession with intent to distribute controlled substances.

2. Title 21 United States Code, Sections 846 and 841(a)(1) – Conspiracy to distribute controlled substances

3. Title 18 United States Code, Section 924(c) – Using a firearm in connection with a drug trafficking offense.

This evidence includes:

1. Any controlled substances, illegal drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

2. United States currency and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

3. Money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed; electronic storage devices, computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from drug distribution and the transfer, investment, control and disposition of those proceeds;

4. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

5. Cellular telephones, telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices;

6. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, money orders, prepaid credit cards, green dot cards, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

9. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Records, items, and documents reflecting shipment or mailing of controlled substances;

11. Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person;

12. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

13. Personal property tending to show the existence and/or location of other stored narcotics including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding; and

14. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

|  |  |
|---|---|
| In the Matter of the Search of | **SEALED** |
|  | )  Case No. |
| 15 Rio Camino Court, Sacramento, California | ) |
|  | )  2:18-SW- 739 KJN |
|  | ) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A-1, attached and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B, attached and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _Sept. 12, 2018_ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☒ between 5:00 a.m. and 10:00 p.m. because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _Aug 29, 2018   4:45 pm_     _____
                                                                                   *Judge's signature*

City and state:      Sacramento, California          Kendall J. Newman, U.S. Magistrate Judge
                                                                                 *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____     _____
Signature of Judge                                                  Date

## ATTACHMENT A-1

### *Location to be Searched*

**Target Residence 1,** 15 Rio Camino Court, Sacramento, California



15 Rio Camino Court is located in Sacramento, California.  The building is a single-story, single-family residence.  It holds about 1202 square-feet, 3 bedrooms, and 2 bathrooms.

The front door and the two-car garage of this residence face east.  The home is located at the end of Rio Camino Court.  It is north of the intersection of Powderhorn Way and Cattle Drive.

The residence is tan in color with white trim.  The front door and garage doors are white in color.  The roof is a dark grey composite shingle type.

The residence can be identified by the numbers "15," which are about 8 inches high and affixed to the garage pillar.

The search of the aforementioned location shall include any and all attachments, including attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.

## ATTACHMENT B

### *Items to be Seized*

All evidence constituting evidence, fruits, proceeds, and instrumentalities of violations of the **Target Offenses**, specifically:

1. Title 21 United States Code, Section 841(a)(1) – Distribution, manufacturing, and possession with intent to distribute controlled substances.

2. Title 21 United States Code, Sections 846 and 841(a)(1) – Conspiracy to distribute controlled substances

3. Title 18 United States Code, Section 924(c) – Using a firearm in connection with a drug trafficking offense.

This evidence includes:

1. Any controlled substances, illegal drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

2. United States currency and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

3. Money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed; electronic storage devices, computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from drug distribution and the transfer, investment, control and disposition of those proceeds;

4. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

5. Cellular telephones, telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices;

6. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, money orders, prepaid credit cards, green dot cards, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

9. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Records, items, and documents reflecting shipment or mailing of controlled substances;

11. Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person;

12. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

13. Personal property tending to show the existence and/or location of other stored narcotics including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding; and

14. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.